WILLIAM N. CARLON (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
Phone: (530) 514-4115
Email: william@carlonlaw.com

NATALIE HERENDEEN (State Bar No. 299286)
Monterey Waterkeeper
P.O. Box 4311
Salinas, CA 93912
Phone: (831) 204-1381
Email: natalie@montereywaterkeeper.org

Attorneys for Plaintiff
MONTEREY WATERKEEPER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MONTEREY WATERKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SANTA CRUZ, a California municipal corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

Plaintiff Monterey Waterkeeper ("Monterey Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I. JURISDICTION AND VENUE

1. Jurisdiction. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act," "CWA," or "Act"), against the City of Santa Cruz ("City" or "Defendant"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United

States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce an effluent standard or limitation). The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2. On July 8, 2026, Plaintiff provided written notice to Defendant, via certified mail, of Defendant's violations of the Act and of its intention to file suit against Defendant, as required by the Act ("CWA Notice Letter"). See 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(2) (1991). Plaintiff mailed the CWA Notice Letter, dated July 2, 2026, to the City Clerk of the City of Santa Cruz; to the City's Director of Public Works, who is the Legally Responsible Person for the Facility under the General Permit, and to the City's Duly Authorized Representative; and to the Facility's Superintendent, Landfill Supervisor, Recycling Center Supervisors, and engineers. Plaintiff also mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Attorney General of the United States; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Central Coast Regional Water Quality Control Board ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(2) (1991). A true and correct copy of the CWA Notice Letter is attached hereto as Exhibit 1 and is incorporated by reference.

3. More than sixty days have passed since Plaintiff served the CWA Notice Letter on Defendant and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. See 33 U.S.C. § 1365(b)(1)(B). This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this District.

5. Divisional Assignment. Assignment to the San Jose Division is proper pursuant to

Civil Local Rules 3-2(c) and 3-2(e) because the source of the violations is located in, and the claims arose in, Santa Cruz County, California.

## II. INTRODUCTION

6. This Complaint seeks relief for Defendant's violations of the CWA at the City of Santa Cruz Resource Recovery Facility, also known as the Santa Cruz City Landfill, owned and operated by Defendant and located at 605 Dimeo Lane, Santa Cruz, California 95060 ("Facility").

7. Defendant discharges pollutant-contaminated storm water and other wastes from the Facility through two outfalls into Lombardi Creek, which flows south through Wilder Ranch State Park to the Lombardi Creek estuary at Three Mile Beach and the Pacific Ocean (collectively, Lombardi Creek, the Lombardi Creek estuary, and the Pacific Ocean are referred to as the "Receiving Waters").

8. The Receiving Waters are waters of the United States.

9. Defendant is violating both the substantive and procedural requirements of the CWA.

10. Defendant's discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's general permit for storm water discharges associated with industrial activity, State Board National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ and Order No. 2018-0028-DWQ ("General Permit" or "Permit").

11. Defendant's violations of the discharge, monitoring, reporting, management practice, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

12. The Facility is an active municipal solid waste landfill and materials recovery facility of approximately 100 acres in a coastal canyon surrounded on three sides by Wilder Ranch State Park. Storm water that falls on the landfill, the waste tipping and recycling areas, the construction and demolition and green waste processing deck, the leachate ponds, and the equipment maintenance area leaves the Facility at the head of Lombardi Creek.

13. Defendant's own monitoring data show that the Facility has discharged storm water containing iron, aluminum, and cadmium at annual average concentrations above the General

Permit's Numeric Action Levels in every reporting year since at least 2021 (and zinc in four of those five reporting years), and that individual discharges have contained aluminum at more than seventy times, cadmium at more than one hundred times, and zinc at more than fifteen times the corresponding action levels. The Facility has been in Level 2 Exceedance Response Action status, the General Permit's highest tier, for total suspended solids, iron, aluminum, cadmium, and zinc continuously since July 1, 2017.

14. The failure on the part of industrial facility operators such as Defendant to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Receiving Waters. With every significant rainfall event, polluted storm water originating from industrial operations such as the Facility discharges to the waters of the State of California and the United States.

15. Wilder Ranch State Park and the coastal streams, lagoons, and beaches within it, including Lombardi Creek and Three Mile Beach, are ecologically sensitive areas and provide habitat for fish, birds, amphibians, and invertebrates, and provide recreational opportunities including hiking, biking, wildlife viewing, photography, beach use, and scientific study.

16. Controlling polluted storm water discharges associated with industrial activity is essential to protecting the Central Coast's surface and coastal waters and essential to Monterey Waterkeeper's mission.

## III. PARTIES

17. Plaintiff Monterey Waterkeeper is a 501(c)(3) environmental, non-profit public benefit organization in accordance with the laws of the State of California. Using law, policy, and science, Monterey Waterkeeper protects and restores drinkable, fishable, and swimmable waters in the Monterey Region and along California's Central Coast for all to enjoy. Monterey Waterkeeper conducts outdoor education and policy advocacy to ensure that all Central Coast residents have access to clean waters. Monterey Waterkeeper also actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, initiates enforcement actions on behalf of itself and its members.

18. Monterey Waterkeeper's mailing address is P.O. Box 4311, Salinas, CA 93912.

19. Monterey Waterkeeper's members live, work, and recreate in Monterey, Santa Cruz, and San Benito Counties, including in and around Wilder Ranch State Park and the coastal waters north of the City of Santa Cruz.

20. Monterey Waterkeeper's members use and enjoy the Receiving Waters and the areas around them for recreation, such as kayaking, picnicking, fishing, hiking, walking, and beach use, as well as for enjoyment of wildlife, photography, and scientific study. Unlawful discharges of pollutants from the Facility into these waters impair Monterey Waterkeeper's members' use and enjoyment of these waters.

21. Defendant's violations of the CWA and the General Permit, including but not limited to its failure to monitor and report its discharges, deprive Monterey Waterkeeper and its members of information to which they are entitled and injure Monterey Waterkeeper's ability to further its mission to protect California's waters. The unlawful discharge of pollutants from the Facility also requires Monterey Waterkeeper to expend its limited resources to study and combat pollution from the Facility.

22. The interests of Monterey Waterkeeper and its members have been, are, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the General Permit.

23. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

24. The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities.

25. Defendant City of Santa Cruz is a municipal corporation organized and existing under the laws of the State of California, with its principal offices at 809 Center Street, Santa Cruz, California 95060.

26. Defendant owns and operates the Facility, through its Public Works Department, and is subject to the terms of the General Permit as the Discharger for the Facility, Waste Discharge Identification ("WDID") No. 3 44I003057.

27. Defendant is a "person" within the meaning of the Act. 33 U.S.C. § 1362(5).

## IV. LEGAL BACKGROUND

### A. The Clean Water Act

28. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

29. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

30. The term "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, solid waste, industrial waste, chemical wastes, biological materials, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

31. A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

32. "Navigable waters" means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

33. The CWA regulates "relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett v. EPA*, 598 U.S. 651, 671 (2023) (quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (plurality opinion)). The *Rapanos* plurality did "not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow

during dry months." *Rapanos*, 547 U.S. at 732 n.5 (plurality opinion).

34. Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and specifically requires an NPDES permit for storm water discharges associated with industrial activity. Id. § 1342(p)(2)(B). Storm water discharges associated with industrial activity include discharges from "[l]andfills, land application sites, and open dumps that receive or have received any industrial wastes . . . including those that are subject to regulation under subtitle D of RCRA." 40 C.F.R. § 122.26(b)(14)(v).

35. Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person," including municipalities, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); id. § 1365(f)(1), (7) (defining "effluent standard or limitation" to include "an unlawful act under subsection (a) of [Section 301]" and "a permit or condition of a permit issued under [Section 402]").

36. An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B. California's General Industrial Storm Water Permit**

37. Section 402(b) of the Act authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b).

38. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California's State Board to issue NPDES permits, including general NPDES permits, in California.

39. The State Board elected to issue a statewide general permit for industrial storm water

discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997, and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The State Board amended the General Permit by Order No. 2015-0122-DWQ and by Order No. 2018-0028-DWQ; the 2018 amendment became effective on July 1, 2020.

40. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent ("NOI"). Landfills, land application sites, and open dumps that receive or have received industrial waste, including facilities subject to regulation under Subtitle D of the Resource Conservation and Recovery Act, are required to obtain coverage. General Permit, Attachment A. Table 1 of the General Permit lists "Landfills and Land Application Facilities" under Standard Industrial Classification ("SIC") code 4953. General Permit, Section XI.B, Table 1.

41. Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit. A violation of the General Permit is a violation of the Act. See General Permit, Section XXI.A. The General Permit contains no upset or bypass defense.

42. In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

43. The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) monitoring and reporting requirements, including the requirement to prepare an annual report and to respond to exceedances of Numeric Action Levels.

44. Discharge Prohibition III.A of the General Permit prohibits all discharges of storm water to waters of the United States except as specifically authorized by the General Permit or another NPDES permit. Discharge Prohibition III.B of the General Permit prohibits, except for the non-storm water discharges authorized in Section IV, "discharges of liquids or materials other than

storm water, either directly or indirectly to waters of the United States," unless authorized by another NPDES permit, and provides that unauthorized non-storm water discharges "must be either eliminated or authorized by a separate NPDES permit." Discharge Prohibition III.C of the General Permit prohibits industrial storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the California Water Code. Discharge Prohibition III.D of the General Permit prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board Water Quality Control Plan ("Basin Plan") or statewide water quality control plans and policies.

45. Receiving Water Limitation VI.A of the General Permit requires dischargers to ensure that industrial storm water discharges and authorized non-storm water discharges do not cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water. Receiving Water Limitation VI.B of the General Permit requires dischargers to ensure that such discharges do not adversely affect human health or the environment. Receiving Water Limitation VI.C of the General Permit requires dischargers to ensure that such discharges do not contain pollutants in quantities that threaten to cause pollution or a public nuisance.

46. Effluent Limitation V.A of the General Permit requires dischargers to implement Best Management Practices ("BMPs") that comply with the Best Available Technology Economically Achievable ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharges in a manner that reflects best industry practice considering technological availability and economic practicability and achievability. BAT applies to toxic and nonconventional pollutants; BCT applies to conventional pollutants. Conventional pollutants include total suspended solids, oil and grease, pH, biochemical oxygen demand, and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15–401.16.

47. Effluent Limitation V.B of the General Permit provides that "[i]ndustrial storm water discharges from facilities subject to storm water ELGs in Subchapter N shall not exceed those storm water ELGs," and that "[t]he ELGs for industrial storm water discharges subject to Subchapter N are

in Attachment F of this General Permit." Attachment F to the General Permit identifies 40 C.F.R. Part 445, Subparts A and B, as the effluent limitation guidelines ("ELGs") applicable to "[r]unoff from hazardous waste and nonhazardous waste landfills."

48. Dischargers subject to Subchapter N must analyze their storm water samples for the "additional parameters specifically required by Subchapter N," General Permit, Section XI.B.6.g; must "[c]ollect and analyze samples from QSEs for each regulated pollutant specified in the appropriate category in Subchapter N," General Permit, Section XI.D.1.a; must submit that information in their Annual Reports, General Permit, Section XI.D.2; and are ineligible for the Representative Sampling Reduction, General Permit, Section XI.D.3.

49. The 2008, 2015, and 2021 versions of the EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which are pollutant concentration values for industrial storm water discharges ("EPA Benchmarks"). See United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective March 1, 2021.

50. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a permitted facility achieve the statutory BAT/BCT standards. See 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); see also 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); 65 Fed. Reg. 64,746, 64,766–67 (Oct. 30, 2000).

51. The discharge of storm water containing pollutant concentrations exceeding EPA Benchmarks evidences a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. See *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 921–25 (C.D. Cal. 2009); see also 80 Fed. Reg. 34,403, 34,405 (June 16, 2015).

52. The following EPA Benchmarks have been established, effective March 1, 2021, for pollutants discharged by Defendant: total suspended solids – 100 mg/L; chemical oxygen demand – 120 mg/L; pH – 6.0–9.0 s.u.; aluminum – 1.1 mg/L; cadmium – 0.0021 mg/L; copper – 0.00519 mg/L; nickel – 0.518 mg/L; and zinc – 0.132 mg/L (the copper benchmark being the freshwater benchmark, and the cadmium, nickel, and zinc benchmarks being the freshwater benchmarks for a

receiving water hardness of 100 mg/L).

53. The General Permit likewise establishes Numeric Action Levels ("NALs") that serve as guidelines for determining whether a facility discharging industrial storm water has implemented BMPs that achieve BAT/BCT. General Permit, Section XII.A and Table 2. The following annual NALs have been established for pollutants discharged by Defendant: total suspended solids – 100 mg/L; oil and grease – 15.0 mg/L; chemical oxygen demand – 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; cadmium – 0.0053 mg/L; copper – 0.0332 mg/L; lead – 0.262 mg/L; nickel – 1.02 mg/L; and zinc – 0.26 mg/L. The following instantaneous maximum NALs have been established for pollutants discharged by Defendant: pH – 6.0–9.0 s.u.; total suspended solids – 400 mg/L; and oil and grease – 25.0 mg/L.

54. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. General Permit, Section XII.A.1. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit, Section XII.A.2. If a discharger has an NAL exceedance during a reporting year, the discharger's status for that parameter changes to Level 1, and the discharger must comply with the Exceedance Response Action ("ERA") requirements set forth in Section XII.C of the General Permit. The discharger's status changes to Level 2 if sampling results indicate an NAL exceedance for a parameter while the discharger is in Level 1 status for that parameter, and the discharger must then comply with Section XII.D of the General Permit.

55. A discharger in Level 2 status must certify and submit via the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") a Level 2 ERA Action Plan prepared by a Qualified Industrial Storm Water Practitioner ("QISP") that addresses each new Level 2 NAL exceedance by January 1 following the reporting year in which the exceedance occurred. A new Level 2 NAL exceedance includes an exceedance of "the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area." General Permit, Section XII.D.1.a. On January 1 of the following reporting year, the discharger must certify and

submit a Level 2 ERA Technical Report prepared by a QISP, and must thereafter update the Level 2 ERA Technical Report with each Annual Report based upon additional NAL exceedances of the same parameter in the same drainage area, facility operational changes, pollutant source changes, and information that becomes available through compliance activities. General Permit, Sections XII.D.2, XII.D.3.c.

56. Where a discharger elects the Industrial Activity BMPs Demonstration, the Level 2 ERA Technical Report must include a description and an evaluation of all industrial pollutant sources that are or may be related to the NAL exceedances. General Permit, Section XII.D.2.a.i–ii. Where the discharger's implemented BMPs "achieve compliance with the effluent limitations of this General Permit and are expected to eliminate future NAL/TNAL exceedance(s)," the report must provide a description and analysis of all implemented BMPs. General Permit, Section XII.D.2.a.iii. Where the implemented BMPs "are not expected to eliminate future NAL/TNAL exceedance(s)," the report must in addition provide "[a]n evaluation of any additional BMPs that would reduce or prevent NAL/TNAL exceedances," the "[e]stimated costs of the additional BMPs evaluated," and "[a]n analysis describing the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented." General Permit, Section XII.D.2.a.iv. The description and analysis of BMPs "shall specifically address the drainage areas where the NAL/TNAL exceedance(s) responsible for the Discharger's Level 2 status occurred." General Permit, Section XII.D.2.a.v.

57. The Water Quality Control Plan for the Central Coastal Basin ("Basin Plan") sets forth water quality standards and prohibitions applicable to Defendant's storm water discharges from the Facility. The Basin Plan provides that "[b]eneficial uses are regarded as existing whether the waterbody is perennial or ephemeral, or the flow is intermittent or continuous," and that surface water bodies within the Region that do not have beneficial uses designated for them in Table 2-1 of the Basin Plan are assigned the beneficial uses of municipal and domestic water supply and protection of both recreation and aquatic life. Basin Plan, Chapter 2, Section 2.1. The Basin Plan designates the existing beneficial uses of the coastal waters from Point Año Nuevo to Soquel Point, into which Lombardi Creek flows, as water contact recreation, non-contact water recreation,

industrial service supply, navigation, marine habitat, shellfish harvesting, commercial and sport fishing, rare, threatened, or endangered species, preservation of biological habitats of special significance, and wildlife habitat. Basin Plan, Chapter 2, Table 2-2.

58. The Basin Plan's water quality objectives for all inland surface waters, enclosed bays, and estuaries provide, among other things, that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses"; that "[w]aters shall not contain settleable material in concentrations that result in deposition of material that causes nuisance or adversely affects beneficial uses"; that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses"; that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life"; and that, for waters not mentioned by a specific beneficial use, "the pH value shall not be depressed below 7.0 or raised above 8.5." Basin Plan, Chapter 3, Section 3.3.2.1. The Basin Plan incorporates the State Board's Water Quality Control Plan for Ocean Waters of California ("Ocean Plan") for ocean waters of the region. Basin Plan, Chapter 3, Section 3.3.1.

59. The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. Id.

60. The SWPPP's site map must show, among other things, areas of soil erosion; the locations of storm water collection and conveyance systems and discharge locations; the locations and descriptions of structural control measures that affect industrial storm water discharges, authorized non-storm water discharges, and run-on; all impervious areas; the locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred; and all "[a]reas of industrial activity subject to this General Permit," including "waste treatment and

disposal areas." General Permit, Section X.E.3.a–f. The SWPPP must include a narrative assessment of all areas of industrial activity with potential industrial pollutant sources. General Permit, Section X.G.2.a. The SWPPP must identify each BMP being implemented and must "identif[y] and justif[y] each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, Section X.H.4.a–b.

61. Dischargers must revise their SWPPP whenever necessary; certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions; and, for non-significant revisions, certify and submit via SMARTS their SWPPP not more than once every three months in the reporting year. General Permit, Section X.B.

62. Dischargers must, to the extent feasible, implement and maintain all of the minimum BMPs identified in Section X.H.1 of the General Permit: (a) good housekeeping; (b) preventive maintenance; (c) spill and leak prevention and response; (d) material handling and waste management; (e) erosion and sediment controls, including "effective stabilization for inactive areas, finished slopes, and other erodible areas prior to a forecasted storm event"; (f) an employee training program; and (g) quality assurance and record keeping. In addition to the minimum BMPs, dischargers must implement advanced BMPs, including exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs, where necessary to reduce or prevent discharges of pollutants in their storm water discharges in a manner that reflects best industry practice. General Permit, Section X.H.2.

63. All new treatment control BMPs employed to comply with Section X.H.2 must be designed to comply with the General Permit's design storm standards, "[a] Factor of Safety shall be incorporated into the design of all treatment control BMPs," and "[a]ll hydrologic calculations shall be certified by a California licensed professional engineer." General Permit, Section X.H.6 & n.15.

64. Section XV of the General Permit requires dischargers to conduct one Annual Comprehensive Facility Compliance Evaluation for each reporting year, including a review and effectiveness assessment of all BMPs for each area of industrial activity, and to revise the SWPPP as appropriate and implement the revisions within 90 days of the evaluation.

65. The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically authorized in Section IV of the General Permit unless authorized by another NPDES permit. General Permit, Section III.B.

66. The General Permit requires dischargers to develop and implement a Monitoring Implementation Plan as part of the SWPPP. General Permit, Section X.I. As part of the Monitoring Implementation Plan, dischargers must identify all storm water discharge locations and must justify any alternative discharge locations. General Permit, Section X.I.2.a, X.I.3.a. Dischargers must conduct monthly visual observations of each drainage area, as well as visual observations during sampling events. General Permit, Sections XI.A.1 and XI.A.2. Any discharger employing flow-based treatment BMPs "shall sample any bypass that occurs while the visual observations and sampling of storm water discharges are conducted." General Permit, Section XI.A.2.b.

67. Dischargers must collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30). General Permit, Section XI.B.2. A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. General Permit, Section XI.B.1. Except as provided in Section XI.C.4, "samples shall be collected from each drainage area at all discharge locations." General Permit, Section XI.B.4. Samples from each discharge location must be collected within four hours of the start of the discharge, or of the start of facility operations if the QSE occurs within the previous 12-hour period. General Permit, Section XI.B.5. Dischargers must analyze all collected samples for total suspended solids, oil and grease, and pH; for additional parameters identified on a facility-specific basis; for the industry-specific parameters set forth in Table 1 of the General Permit; for additional parameters related to receiving waters with 303(d)-listed impairments or approved TMDLs; and, for discharges subject to Subchapter N, for the additional parameters specifically required by Subchapter N. General Permit, Section XI.B.6.

68. Dischargers must ensure that the collection, preservation, and handling of all storm water samples are in accordance with Attachment H to the General Permit, which directs, among other things, that samples "should be kept as close to 4 degrees Celsius (39 degrees Fahrenheit) as

possible until arriving to the laboratory" and that dischargers "[d]o not freeze samples," and must ensure that all laboratory analyses are performed according to test procedures under 40 C.F.R. Part 136, "including the observation of holding times." General Permit, Sections XI.B.8, XI.B.10; Attachment H, ¶ 13.

69. Dischargers must submit all sampling and analytical results via SMARTS within 30 days of obtaining all results for each sampling event. General Permit, Section XI.B.11.a.

70. Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year. General Permit, Section XVI.A. The Annual Report must include a compliance checklist indicating whether the discharger complies with, and has addressed, all applicable requirements of the General Permit; an explanation for any non-compliance within the reporting year; an identification of all revisions made to the SWPPP within the reporting year; and the date of the Annual Evaluation. General Permit, Section XVI.B. All reports, certifications, and other information submitted via SMARTS must be certified by the discharger's Legally Responsible Person or Duly Authorized Representative under penalty of law. General Permit, Section XXI.K–L.

**C. The Landfill Effluent Limitation Guidelines**

71. EPA has promulgated effluent limitation guidelines and standards for the Landfills Point Source Category at 40 C.F.R. Part 445 (2000). Part 445 "applies to discharges of wastewater from landfill units." 40 C.F.R. § 445.1(a). Subpart B of Part 445 applies to "discharges of wastewater from landfills subject to the provisions of 40 CFR part 258, Criteria for Municipal Solid Waste Landfills; and 40 CFR part 257, Criteria for Classification of Solid Waste Disposal Facilities and Practices." 40 C.F.R. § 445.20.

72. "Landfill wastewater" means "all wastewater associated with, or produced by, landfilling activities except for sanitary wastewater, non-contaminated storm water, contaminated ground water, and wastewater from recovery pumping wells," and includes contaminated storm water. 40 C.F.R. § 445.2(f). "Contaminated storm water" means "storm water which comes in direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater . . . . Some specific areas of a landfill that may produce contaminated storm water include (but are not limited to): the open face of an active landfill with exposed waste (no cover added); the areas around

wastewater treatment operations; trucks, equipment or machinery that has been in direct contact with the waste; and waste dumping areas." 40 C.F.R. § 445.2(b).

73. For discharges of contaminated storm water from non-hazardous waste landfills, 40 C.F.R. §§ 445.21 through 445.23 establish effluent limitations representing the application of the best practicable control technology currently available, BCT, and BAT, respectively, consisting of the following maximum daily and maximum monthly average limitations: five-day biochemical oxygen demand ("BOD5") – 140 and 37 mg/L; total suspended solids – 88 and 27 mg/L; ammonia (as N) – 10 and 4.9 mg/L; alpha-terpineol – 0.033 and 0.016 mg/L; benzoic acid – 0.12 and 0.071 mg/L; p-cresol – 0.025 and 0.014 mg/L; phenol – 0.026 and 0.015 mg/L; zinc – 0.20 and 0.11 mg/L; and pH within the range of 6.0 to 9.0. 40 C.F.R. §§ 445.21–445.23. Through Effluent Limitation V.B and Attachment F, the General Permit incorporates these limitations as conditions of the General Permit.

## V. STATEMENT OF FACTS

### A. The Facility

74. Defendant owns and operates the Facility, an approximately 100-acre site at 605 Dimeo Lane, Santa Cruz, California 95060, located approximately one-half mile north of Highway 1 and approximately one mile north of the Pacific Ocean, in a north-south trending, steep-walled canyon surrounded on three sides by Wilder Ranch State Park.

75. According to its SWPPP, last revised August 31, 2026 and certified and uploaded to SMARTS as SWPPP Amendment 16 ("2026 SWPPP"), the Facility includes approximately 32.7 acres of industrial activity areas, and the Facility's scheduled operating hours are Monday through Saturday, 6:00 a.m. to 3:30 p.m.

76. The Facility consists of an active Class III municipal solid waste landfill; a materials recovery facility ("MRF") with a public tipping area, a recycling center and drop-off area, a household hazardous waste drop-off area, and a food waste pre-processing area; a diversion or south deck used for stockpiling and processing construction and demolition ("C&D") materials, green waste, and wood waste; an equipment and vehicle maintenance area; fuel and used oil storage; a leachate collection and removal system ("LCRS") with two Class II surface leachate ponds, a

leachate pumping station with a 500-gallon diesel fuel tank, and a transport pipeline to the City's wastewater treatment facility; and closed and inactive landfill cells under intermediate and final cover.

77. Industrial activities at the Facility include receiving, transporting, processing, and disposing of municipal solid waste, C&D materials, green and wood waste, recyclables, food waste, and household hazardous waste; landfilling in Cell 3B; excavation, stockpiling, and handling of soil and cover material; storage of petroleum products; vehicle and equipment maintenance; and vehicle storage.

78. Defendant's SWPPP states that Cell 1 of the landfill "was constructed in 1996-1997 to properly bury chromium waste" excavated from former leachate evaporation ponds that had also been used to dispose of sludge from a local tannery. 2026 SWPPP, Section 4.2.

79. On or about April 2, 1992, Defendant submitted a Notice of Intent to comply with the predecessor to the General Permit for the Facility, and the Facility was assigned WDID No. 3 44I003057. Defendant has recertified its NOI under the General Permit, most recently on or about July 17, 2023, under SIC code 4953 (Refuse Systems).

80. Since at least April 2, 1992, the Facility has operated under General Permit coverage. Plaintiff is informed and believes, and thereupon alleges, that Defendant has never filed a Notice of Non-Applicability, a Notice of Termination, or a No Exposure Certification for the Facility.

81. Defendant's SWPPP states that "[m]ost of the facility activities are directly exposed to precipitation and stormwater runoff" (SWPPP Amendment 11, Section 2.1.3 (June 30, 2021); SWPPP Amendment 12, Section 2.1.3 (December 8, 2021)) and that "much of the Facility is exposed to precipitation and stormwater runoff" (2026 SWPPP, Section 4.2).

82. Defendant's SWPPP divides the Facility into five storm water drainage areas. Drainage Areas 1, 3, and 5 drain to the outfall Defendant names the "Lombardi Creek Stormwater Outlet" ("SW-1"), and Drainage Areas 2 and 4 drain, through the North and West Ponds and a "Freshwater Bypass" tunnel, to the outfall Defendant names the "Lombardi Creek Freshwater Bypass Outlet" ("SW-2"). Each outfall discharges into Lombardi Creek at the southern toe of the landfill.

83. Drainage Area 1 contains the MRF, including the public tipping area, recycling center drop-off, household hazardous waste drop-off, food waste pre-processing, and the equipment and vehicle maintenance area, together with the employee parking lot. Runoff from Drainage Area 1 flows to a diversion box and, when a treatment system is installed and operating, up to 321 gallons per minute flows through the treatment system and is sampled at monitoring location TC-1 before discharge to the storm drain system and SW-1. Flow above 321 gallons per minute, and all flow when no treatment system is installed or operating, bypasses treatment, passes through a bioswale, and is sampled, when it is sampled, at monitoring location SP-1. Runoff from the public tipping area is directed to an underground holding tank that is pumped out by vacuum truck and disposed of in the LCRS or at the City's wastewater treatment facility.

84. Drainage Area 2 contains the western slope of the Cell 3B soil stockpile, the West Canyon, and the West Perimeter, including the west-facing slopes of closed and inactive landfill cells. Runoff flows over vegetated swales on the landfill benches to the West Canyon Road, where it is sampled at monitoring location SP-2, and then to the West Pond and SW-2.

85. Drainage Area 3 contains most of Cell 2, Cells 3A and 3B, part of the future Cell 4 area, the landfill's east slope, and the diversion or south deck where green waste, wood waste, and C&D materials are stockpiled and processed. Landfilling is ongoing in Cell 3B. Runoff from the diversion deck, the lined upper slopes east of Cell 3B, the floor of Cell 3B outside the active face, and the northern portion of the drainage area is collected in the Cell 3B sedimentation basin, which discharges through an inlet and overflow pipe to the storm drain system and SW-1. Monitoring location SP-3 is adjacent to the Cell 3B inlet. Compactors, haul trucks, and other equipment that work the active face travel on roads and areas that drain to the Cell 3B sedimentation basin.

86. Defendant's SWPPP acknowledges that leachate seeps occur at the active face during storms; that Defendant inspects the active face daily during rainstorms and takes corrective action when seeps appear outside the containment berms "to prevent the discharge of leachate into the storm drain system"; and that when leachate seeps "outside containment berms," Defendant digs trenches in the toe of the garbage slope "to direct the leachate back into the waste prism" or constructs berms "to contain the leachate." 2026 SWPPP, Table 6 (Spill and Leak Prevention,

Leachate Seeps at Active Face). Defendant's SWPPP identified "Landfill Seeps" as a storm water exposure pathway for municipal solid waste, C&D materials, and green waste. SWPPP Amendment 11, Table 2.1 (June 30, 2021).

87. Drainage Area 4 contains the northern slope of the soil stockpile at the north end of the landfill and drains to the North Pond, the West Pond, and SW-2. It is sampled at monitoring location SP-4.

88. Drainage Area 5 contains the South Canyon, the two Class II leachate ponds, the leachate pumping station and its diesel fuel tank, the leachate transport pipeline, the groundwater interceptor trench and barrier wall at the toe of the landfill, and portions of the landfill under intermediate and final cover. Storm water from Drainage Area 5 flows over the slopes into drainage inlets that discharge to SW-1. Defendant has never established a sampling location for Drainage Area 5 and has never sampled its discharges before they commingle with discharges from Drainage Areas 1 and 3.

89. Until August 31, 2026, Defendant's SWPPPs did not designate any part of Drainage Area 5 as an area of industrial activity. The 2026 SWPPP designates the leachate ponds as industrial and describes the remainder of Drainage Area 5 as non-industrial.

90. In December 2020, a break in the buried leachate pipeline released an estimated 900 gallons of leachate, some unmeasured amount of which, in Defendant's words, "was observed entering a nearby stormwater catch basin along the road and collected at the Lombardi Creek outlet box." SWPPP Amendment 11, Section 2.3.2 (June 30, 2021).

91. Defendant's SWPPP identifies total suspended solids, chemical oxygen demand, pH, oil and grease, and metals as pollutants associated with the landfill fill areas, the diversion deck, the public tipping area, the recycling area, and the equipment maintenance area, and identifies leachate as present throughout the landfill and at the leachate pump station.

92. The areas of industrial activity described above are sources of pollutants at the Facility. From these areas, the Facility discharges storm water containing pollutants, including sediment, iron, aluminum, cadmium, copper, zinc, oxygen-demanding substances, and acidic water, through SW-1 and SW-2 to Lombardi Creek, the Lombardi Creek estuary, and the Pacific Ocean.

**B. The Receiving Waters**

93. Before the landfill was built, two creeks flowed from the upper reaches of the North and West Canyons on the property and converged near the middle of the property to form Lombardi Creek. Defendant's refuse fill now blocks those creeks. To carry them around the waste prism, Defendant constructed a "Freshwater Bypass" system of two tunnels that routes the creek water around the landfill and, in Defendant's words, "back into the natural grade of Lombardi Creek down-gradient of the southern 'toe' of the landfill." 2026 SWPPP, Section 4.4.

94. Defendant's SWPPP identifies Lombardi Creek as the receiving water for the Facility's storm water discharges, states that "[s]urface drainage at the Facility currently flows to the south, towards Lombardi Creek and ultimately to a small estuary and the Pacific Ocean," and states that the Facility "discharges stormwater to Lombardi Creek that flows to a small estuary and then the Pacific Ocean approximately ¾ of a mile west of the Facility." 2026 SWPPP, Sections 4.4, 6. Defendant's NOI identifies Lombardi Creek as the receiving water for the Facility.

95. Lombardi Creek flows from the Facility's outfalls south through a defined channel, under Highway 1 through a culvert, through a channel along a former agricultural field, through an excavated channel under the railroad line, and through a densely vegetated riparian canyon within Wilder Ranch State Park into a small coastal estuary at Three Mile Beach, and from the estuary to the Pacific Ocean.

96. In 2000 and 2001 the California Department of Parks and Recreation carried out the Lombardi Creek Restoration Project (State Clearinghouse No. 2000042098), approved by the California Coastal Commission in July 2000, which converted 4.6 acres of agricultural land to wetlands, excavated sediment from the Lombardi Creek estuary, and realigned the lower creek into a sinuous channel. The Coastal Commission found that the project would "restore and enhance coastal marsh, creek, and tidal estuary habitat," and its staff report states that the project was funded from a settlement arising out of sedimentation of Lombardi Creek during the 1995–1996 season involving drilling at the City of Santa Cruz Landfill, and that the applicant had submitted permit applications to the United States Army Corps of Engineers and the Regional Board for the project.

97. Lombardi Creek is a relatively permanent, standing or continuously flowing body of

water forming a geographic feature described in ordinary parlance as a stream or creek. Plaintiff is informed and believes, and thereupon alleges, that Lombardi Creek below the Facility's outfalls flows continuously for months at a time during and after each wet season, from sources that include the two canyon streams carried by the Freshwater Bypass and groundwater, and not merely in direct response to rainfall, and that it flows in a defined bed and bank to the Lombardi Creek estuary and the Pacific Ocean.

98. Lombardi Creek is a tributary of the Lombardi Creek estuary and the Pacific Ocean.

99. Lombardi Creek is a water of the United States.

100. The Lombardi Creek estuary is a water of the United States.

101. The Pacific Ocean is a water of the United States.

102. In the alternative, pollutants discharged from the Facility's outfalls SW-1 and SW-2 travel by surface flow through the channel of Lombardi Creek, a distance of approximately three-quarters of a mile, to the Lombardi Creek estuary and the Pacific Ocean, maintaining their identity as sediment, metals, and other pollutants, so that Defendant's discharges are additions of pollutants to navigable waters from a point source and the functional equivalent of direct discharges to those waters.

**C. The Facility's Storm Water Discharges**

103. Defendant discharges storm water containing pollutants, including aluminum, cadmium, iron, zinc, copper, chemical oxygen demand, total suspended solids, and compounds affecting pH, from the Facility during every significant rain event.

104. Defendant's storm water sampling results, as reported by Defendant to the State Board via SMARTS under penalty of law, are conclusive evidence of the pollutant concentrations in the Facility's storm water discharges. See *Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1491–92 (9th Cir. 1987), *vacated*, 485 U.S. 931 (1988), *reinstated and amended*, 853 F.2d 667 (9th Cir. 1988).

105. Since November 2021, Defendant has reported storm water sampling results to SMARTS from monitoring locations TC-1, SP-1, SP-2, and SP-3; since December 2022, from SP-4; and, on December 24, 2024, from the outfalls SW-1 and SW-2. The sampling results alleged in this

Section are taken from the Ad Hoc Monitoring Reports Defendant certified and submitted to SMARTS for each sampling event, and the annual averages alleged below are the arithmetic averages of all results Defendant reported for the Facility in each reporting year, with results below the laboratory reporting limit averaged as reported.

**1. Aluminum**

106. During the 2021–2022 reporting year, storm water samples collected by Defendant at the Facility contained aluminum in excess of the annual NAL for aluminum (0.75 mg/L) on November 9, 2021 at SP-3 (19 mg/L); on December 22, 2021 at TC-1 (0.81 mg/L) and SP-2 (0.91 mg/L) and SP-3 (5.3 mg/L); on March 19, 2022 at SP-2 (5.3 mg/L); on March 28, 2022 at SP-2 (1.8 mg/L) and SP-3 (10 mg/L); on April 11, 2022 at SP-1 (1.7 mg/L) and SP-3 (19 mg/L).

107. During the 2022–2023 reporting year, storm water samples collected by Defendant at the Facility contained aluminum in excess of the annual NAL for aluminum (0.75 mg/L) on November 8, 2022 at SP-2 (3.6 mg/L) and SP-3 (13 mg/L); on December 1, 2022 at SP-2 (18 mg/L) and SP-4 (10 mg/L); on December 27, 2022 at SP-1 (9.8 mg/L) and SP-3 (21 mg/L) and SP-4 (9.1 mg/L); on February 3, 2023 at SP-2 (3.5 mg/L) and SP-3 (9 mg/L) and SP-4 (17 mg/L); on March 28, 2023 at SP-2 (1.4 mg/L) and SP-3 (1.7 mg/L) and SP-4 (54 mg/L).

108. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained aluminum in excess of the annual NAL for aluminum (0.75 mg/L) on December 6, 2023 at SP-1 (14 mg/L) and SP-2 (6.2 mg/L); on December 18, 2023 at SP-1 (3.7 mg/L) and SP-2 (2.3 mg/L) and SP-4 (5.3 mg/L); on December 27, 2023 at SP-4 (1.8 mg/L); on January 31, 2024 at SP-4 (26 mg/L); on February 17, 2024 at TC-1 (7.2 mg/L) and SP-2 (1.2 mg/L) and SP-3 (4.4 mg/L) and SP-4 (40 mg/L); on March 2, 2024 at TC-1 (16 mg/L) and SP-1 (5.8 mg/L) and SP-3 (4 mg/L); on April 22, 2024 at TC-1 (4.2 mg/L).

109. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained aluminum in excess of the annual NAL for aluminum (0.75 mg/L) on November 22, 2024 at SP-1 (17 mg/L) and SP-4 (1.7 mg/L); on December 12, 2024 at SP-1 (13 mg/L); on December 24, 2024 at TC-1 (3.1 mg/L) and SP-2 (2.7 mg/L) and SW-1 (5 mg/L) and SW-2 (1.5 mg/L); on January 31, 2025 at SP-2 (2.1 mg/L) and SP-4 (1.3 mg/L); on February 13, 2025 at

SP-1 (13 mg/L) and SP-2 (6.9 mg/L) and SP-3 (3.1 mg/L) and SP-4 (2.8 mg/L); on April 28, 2025 at TC-1 (2.7 mg/L).

110. During the 2025–2026 reporting year, storm water samples collected by Defendant at the Facility contained aluminum in excess of the annual NAL for aluminum (0.75 mg/L) on October 13, 2025 at SP-2 (2.21 mg/L) and SP-4 (2.38 mg/L); on November 13, 2025 at SP-1 (2.87 mg/L); on April 10, 2026 at SP-1 (3.34 mg/L) and SP-2 (11.1 mg/L) and SP-4 (4.45 mg/L); on April 20, 2026 at SP-1 (2.4 mg/L) and SP-4 (1.15 mg/L).

111. The average concentration of aluminum in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for aluminum (0.75 mg/L) in the following reporting years: 2021–2022 (4.57 mg/L); 2022–2023 (9.55 mg/L); 2023–2024 (7.98 mg/L); 2024–2025 (4.07 mg/L); 2025–2026 (2.34 mg/L).

112. Each of the aluminum results alleged above that exceeds 1.1 mg/L also exceeds the EPA Benchmark for aluminum.

**2. Cadmium**

113. During the 2021–2022 reporting year, storm water samples collected by Defendant at the Facility contained cadmium in excess of the annual NAL for cadmium (0.0053 mg/L) on November 9, 2021 at SP-3 (0.2 mg/L); on December 22, 2021 at SP-2 (0.019 mg/L) and SP-3 (0.043 mg/L); on March 28, 2022 at SP-2 (0.032 mg/L) and SP-3 (0.059 mg/L); on April 11, 2022 at SP-3 (0.085 mg/L).

114. During the 2022–2023 reporting year, storm water samples collected by Defendant at the Facility contained cadmium in excess of the annual NAL for cadmium (0.0053 mg/L) on November 8, 2022 at SP-3 (0.044 mg/L); on December 1, 2022 at SP-4 (0.0067 mg/L); on December 27, 2022 at SP-3 (0.09 mg/L) and SP-4 (0.044 mg/L); on February 3, 2023 at SP-2 (0.017 mg/L) and SP-3 (0.027 mg/L) and SP-4 (0.24 mg/L); on March 28, 2023 at SP-3 (0.0065 mg/L) and SP-4 (0.54 mg/L).

115. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained cadmium in excess of the annual NAL for cadmium (0.0053 mg/L) on December 18, 2023 at SP-4 (0.05 mg/L); on December 27, 2023 at SP-4 (0.041 mg/L); on January

31, 2024 at SP-4 (0.45 mg/L); on February 17, 2024 at SP-3 (0.021 mg/L) and SP-4 (0.18 mg/L); on March 2, 2024 at SP-3 (0.02 mg/L).

116. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained cadmium in excess of the annual NAL for cadmium (0.0053 mg/L) on December 12, 2024 at SP-2 (0.012 mg/L); on December 24, 2024 at SP-2 (0.053 mg/L) and SW-1 (0.011 mg/L) and SW-2 (0.015 mg/L); on February 13, 2025 at SP-2 (0.034 mg/L) and SP-3 (0.025 mg/L) and SP-4 (0.14 mg/L).

117. During the 2025–2026 reporting year, storm water samples collected by Defendant at the Facility contained cadmium in excess of the annual NAL for cadmium (0.0053 mg/L) on February 25, 2026 at SP-2 (0.00658 mg/L); on April 10, 2026 at SP-2 (0.0591 mg/L) and SP-4 (0.00599 mg/L); on April 20, 2026 at SP-4 (0.00562 mg/L).

118. The average concentration of cadmium in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for cadmium (0.0053 mg/L) in the following reporting years: 2021–2022 (0.0315 mg/L); 2022–2023 (0.0569 mg/L); 2023–2024 (0.0431 mg/L); 2024–2025 (0.0159 mg/L); 2025–2026 (0.00615 mg/L).

119. Each of the cadmium results alleged above also exceeds the EPA Benchmark for cadmium.

**3. Iron**

120. During the 2021–2022 reporting year, storm water samples collected by Defendant at the Facility contained iron in excess of the annual NAL for iron (1.0 mg/L) on November 9, 2021 at SP-3 (2.9 mg/L); on December 22, 2021 at SP-3 (1.5 mg/L); on March 19, 2022 at SP-2 (6.3 mg/L); on March 28, 2022 at SP-3 (2.1 mg/L); on April 11, 2022 at TC-1 (2.8 mg/L) and SP-1 (2 mg/L) and SP-3 (7 mg/L); on May 19, 2022 at TC-1 (1.9 mg/L).

121. During the 2022–2023 reporting year, storm water samples collected by Defendant at the Facility contained iron in excess of the annual NAL for iron (1.0 mg/L) on November 8, 2022 at SP-2 (4.7 mg/L) and SP-3 (8.7 mg/L); on December 1, 2022 at TC-1 (2.5 mg/L) and SP-2 (17 mg/L) and SP-4 (12 mg/L); on December 27, 2022 at SP-1 (10 mg/L) and SP-3 (6.6 mg/L) and SP-4 (3.8 mg/L); on February 3, 2023 at TC-1 (1.5 mg/L) and SP-2 (3 mg/L) and SP-3 (4.4 mg/L); on March

28, 2023 at TC-1 (1.7 mg/L) and SP-2 (3.3 mg/L) and SP-3 (2.1 mg/L); on April 27, 2023 at TC-1 (4.8 mg/L).

122. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained iron in excess of the annual NAL for iron (1.0 mg/L) on December 6, 2023 at SP-1 (16 mg/L) and SP-2 (7.4 mg/L); on December 18, 2023 at SP-1 (4.3 mg/L) and SP-2 (2.6 mg/L) and SP-4 (4.1 mg/L); on December 27, 2023 at SP-4 (1.1 mg/L); on January 31, 2024 at SP-2 (1.8 mg/L) and SP-4 (1.2 mg/L); on February 17, 2024 at SP-2 (2.9 mg/L) and SP-3 (26 mg/L) and SP-4 (3 mg/L); on March 2, 2024 at SP-3 (23 mg/L).

123. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained iron in excess of the annual NAL for iron (1.0 mg/L) on November 22, 2024 at SP-1 (20 mg/L) and SP-4 (2.9 mg/L); on December 12, 2024 at SP-1 (17 mg/L); on December 24, 2024 at TC-1 (3.4 mg/L) and SW-1 (2.6 mg/L) and SW-2 (13 mg/L); on January 31, 2025 at SP-2 (2.3 mg/L) and SP-4 (1.5 mg/L); on February 13, 2025 at TC-1 (1.3 mg/L) and SP-1 (13 mg/L) and SP-3 (1.5 mg/L); on April 28, 2025 at TC-1 (8.4 mg/L).

124. During the 2025–2026 reporting year, storm water samples collected by Defendant at the Facility contained iron in excess of the annual NAL for iron (1.0 mg/L) on October 13, 2025 at SP-2 (2.64 mg/L) and SP-4 (2.7 mg/L); on November 5, 2025 at SP-4 (1.07 mg/L); on November 13, 2025 at SP-1 (3.84 mg/L); on February 25, 2026 at TC-1 (2.02 mg/L) and SP-2 (1.64 mg/L); on April 10, 2026 at SP-1 (4.11 mg/L) and SP-2 (7.32 mg/L) and SP-4 (5.45 mg/L); on April 20, 2026 at SP-1 (3.21 mg/L).

125. The average concentration of iron in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for iron (1.0 mg/L) in the following reporting years: 2021–2022 (2.1 mg/L); 2022–2023 (4.89 mg/L); 2023–2024 (5.34 mg/L); 2024–2025 (4.76 mg/L); 2025–2026 (2.62 mg/L).

**4. Zinc**

126. During the 2021–2022 reporting year, storm water samples collected by Defendant at the Facility contained zinc in excess of the annual NAL for zinc (0.26 mg/L) on November 9, 2021 at SP-3 (2.7 mg/L); on December 22, 2021 at SP-3 (0.88 mg/L); on March 28, 2022 at SP-2 (0.32

mg/L) and SP-3 (0.84 mg/L); on April 11, 2022 at SP-3 (1.9 mg/L).

127. During the 2022–2023 reporting year, storm water samples collected by Defendant at the Facility contained zinc in excess of the annual NAL for zinc (0.26 mg/L) on November 8, 2022 at SP-3 (0.64 mg/L); on December 27, 2022 at SP-1 (0.27 mg/L) and SP-3 (1 mg/L) and SP-4 (0.48 mg/L); on February 3, 2023 at SP-4 (2 mg/L); on March 28, 2023 at SP-4 (4.1 mg/L).

128. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained zinc in excess of the annual NAL for zinc (0.26 mg/L) on December 6, 2023 at SP-1 (0.82 mg/L); on December 18, 2023 at SP-4 (0.5 mg/L); on December 27, 2023 at SP-4 (0.46 mg/L); on January 31, 2024 at SP-4 (3.3 mg/L); on February 17, 2024 at SP-3 (0.78 mg/L) and SP-4 (2.3 mg/L); on March 2, 2024 at SP-3 (0.64 mg/L).

129. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained zinc in excess of the annual NAL for zinc (0.26 mg/L) on November 22, 2024 at SP-1 (0.98 mg/L); on December 24, 2024 at SP-2 (0.51 mg/L); on February 13, 2025 at SP-2 (0.4 mg/L) and SP-3 (0.35 mg/L) and SP-4 (1.2 mg/L).

130. During the 2025–2026 reporting year, storm water samples collected by Defendant at the Facility contained zinc in excess of the annual NAL for zinc (0.26 mg/L) on November 13, 2025 at SP-1 (0.263 mg/L); on April 10, 2026 at SP-1 (0.291 mg/L) and SP-2 (0.668 mg/L); on April 20, 2026 at SP-1 (0.273 mg/L).

131. The average concentration of zinc in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for zinc (0.26 mg/L) in the following reporting years: 2021–2022 (0.512 mg/L); 2022–2023 (0.537 mg/L); 2023–2024 (0.524 mg/L); 2024–2025 (0.262 mg/L).

132. Each of the zinc results alleged above also exceeds the EPA Benchmark for zinc (0.132 mg/L), and Defendant has reported numerous additional zinc results between 0.132 and 0.26 mg/L that exceed the EPA Benchmark for zinc, as identified in Section II.A.7 of the CWA Notice Letter.

**5. Copper**

133. During the 2021–2022 reporting year, storm water samples collected by Defendant at

the Facility contained copper in excess of the annual NAL for copper (0.0332 mg/L) on November 9, 2021 at SP-2 (0.038 mg/L) and SP-3 (0.086 mg/L); on December 22, 2021 at SP-2 (0.036 mg/L); on March 28, 2022 at SP-2 (0.037 mg/L) and SP-3 (0.034 mg/L); on April 11, 2022 at SP-3 (0.08 mg/L).

134. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained copper in excess of the annual NAL for copper (0.0332 mg/L) on December 6, 2023 at SP-1 (0.053 mg/L); on February 17, 2024 at SP-2 (0.037 mg/L) and SP-3 (0.04 mg/L).

135. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained copper in excess of the annual NAL for copper (0.0332 mg/L) on November 22, 2024 at SP-1 (0.058 mg/L); on December 12, 2024 at SP-2 (0.034 mg/L); on February 13, 2025 at SP-2 (0.04 mg/L).

136. Each of the copper results alleged above also exceeds the EPA Benchmark for copper (0.00519 mg/L), and Defendant has reported numerous additional copper results between 0.00519 and 0.0332 mg/L that exceed the EPA Benchmark for copper, as identified in Section II.A.5 of the CWA Notice Letter.

**6. Chemical Oxygen Demand**

137. During the 2021–2022 reporting year, storm water samples collected by Defendant at the Facility contained chemical oxygen demand in excess of the annual NAL and EPA Benchmark for chemical oxygen demand (120 mg/L) on November 9, 2021 at SP-2 (230 mg/L); on December 22, 2021 at SP-2 (210 mg/L); on March 28, 2022 at SP-2 (210 mg/L).

138. During the 2022–2023 reporting year, storm water samples collected by Defendant at the Facility contained chemical oxygen demand in excess of the annual NAL and EPA Benchmark for chemical oxygen demand (120 mg/L) on December 1, 2022 at SP-4 (130 mg/L); on December 27, 2022 at SP-4 (240 mg/L); on February 3, 2023 at SP-2 (270 mg/L); on March 28, 2023 at SP-2 (350 mg/L) and SP-3 (230 mg/L).

139. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained chemical oxygen demand in excess of the annual NAL and EPA Benchmark for chemical oxygen demand (120 mg/L) on December 6, 2023 at SP-1 (290 mg/L); on December

18, 2023 at SP-2 (140 mg/L) and SP-4 (200 mg/L); on January 31, 2024 at SP-2 (330 mg/L); on February 17, 2024 at SP-2 (330 mg/L) and SP-3 (1,200 mg/L); on March 2, 2024 at SP-3 (1,100 mg/L).

140. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained chemical oxygen demand in excess of the annual NAL and EPA Benchmark for chemical oxygen demand (120 mg/L) on November 22, 2024 at SP-1 (550 mg/L); on December 12, 2024 at SP-2 (310 mg/L); on January 31, 2025 at SP-4 (170 mg/L); on February 13, 2025 at SP-1 (140 mg/L) and SP-2 (150 mg/L) and SP-3 (150 mg/L) and SP-4 (160 mg/L).

141. During the 2025–2026 reporting year, storm water samples collected by Defendant at the Facility contained chemical oxygen demand in excess of the annual NAL and EPA Benchmark for chemical oxygen demand (120 mg/L) on October 13, 2025 at SP-4 (149 mg/L); on November 13, 2025 at SP-1 (130 mg/L); on February 25, 2026 at SP-2 (258 mg/L); on April 10, 2026 at SP-1 (142 mg/L); on April 20, 2026 at SP-1 (142 mg/L).

142. The average concentration of chemical oxygen demand in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for chemical oxygen demand (120 mg/L) in the following reporting years: 2022–2023 (123 mg/L); 2023–2024 (242 mg/L); 2024–2025 (132 mg/L).

**7. Total Suspended Solids**

143. During the 2021–2022 reporting year, storm water samples collected by Defendant at the Facility contained total suspended solids in excess of the annual NAL and EPA Benchmark for total suspended solids (100 mg/L) on March 19, 2022 at SP-2 (265 mg/L).

144. During the 2022–2023 reporting year, storm water samples collected by Defendant at the Facility contained total suspended solids in excess of the annual NAL and EPA Benchmark for total suspended solids (100 mg/L) on November 8, 2022 at SP-2 (116 mg/L) and SP-3 (165 mg/L); on December 1, 2022 at SP-2 (137 mg/L) and SP-4 (264 mg/L); on December 27, 2022 at SP-1 (265 mg/L) and SP-3 (252 mg/L) and SP-4 (224 mg/L); on February 3, 2023 at SP-3 (137 mg/L).

145. During the 2023–2024 reporting year, storm water samples collected by Defendant at the Facility contained total suspended solids in excess of the annual NAL and EPA Benchmark for

total suspended solids (100 mg/L) on December 6, 2023 at SP-1 (300 mg/L) and SP-2 (434 mg/L); on December 18, 2023 at SP-1 (136 mg/L) and SP-2 (136 mg/L); on February 17, 2024 at SP-4 (156 mg/L).

146. During the 2024–2025 reporting year, storm water samples collected by Defendant at the Facility contained total suspended solids in excess of the annual NAL and EPA Benchmark for total suspended solids (100 mg/L) on November 22, 2024 at SP-1 (488 mg/L); on December 12, 2024 at SP-1 (202 mg/L); on February 13, 2025 at SP-1 (330 mg/L).

147. During the 2025–2026 reporting year, storm water samples collected by Defendant at the Facility contained total suspended solids in excess of the annual NAL and EPA Benchmark for total suspended solids (100 mg/L) on April 10, 2026 at SP-2 (240 mg/L).

148. The average concentration of total suspended solids in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for total suspended solids (100 mg/L) in the following reporting years: 2022–2023 (101 mg/L).

**8. pH**

149. The storm water samples collected by Defendant at the Facility at SP-3 on November 9, 2021 (3.8 s.u.); SP-3 on December 22, 2021 (4.4 s.u.); SP-3 on March 28, 2022 (3.8 s.u.); SP-3 on April 11, 2022 (3.7 s.u.); SP-3 on November 8, 2022 (4.9 s.u.); SP-3 on December 27, 2022 (4.1 s.u.); SP-3 on February 3, 2023 (5.8 s.u.); SP-4 on February 3, 2023 (4.9 s.u.); SP-4 on March 28, 2023 (4.6 s.u.); SP-4 on December 18, 2023 (5 s.u.); SP-4 on January 31, 2024 (4.8 s.u.); SP-4 on February 17, 2024 (4.3 s.u.) had a pH outside the EPA Benchmark and instantaneous maximum NAL range for pH (6.0–9.0 s.u.), outside the effluent limitation range for pH in 40 C.F.R. § 445.21 (6.0–9.0 s.u.), and outside the Basin Plan's pH objective for inland surface waters (7.0–8.5 s.u.).

150. The pH results at SP-3 in the 2021–2022 reporting year, at SP-3 and SP-4 in the 2022–2023 reporting year, and at SP-4 in the 2023–2024 reporting year each constitute an instantaneous maximum NAL exceedance for pH in the respective reporting year.

**9. Exceedances of the Landfill Effluent Limitation Guidelines**

151. The storm water samples collected by Defendant at the Facility contained total suspended solids in excess of the maximum daily effluent limitation for total suspended solids in 40

C.F.R. § 445.21 (88 mg/L) on March 19, 2022 at SP-2 (265 mg/L); on November 8, 2022 at SP-2 (116 mg/L) and SP-3 (165 mg/L); on December 1, 2022 at SP-2 (137 mg/L) and SP-4 (264 mg/L); on December 27, 2022 at SP-1 (265 mg/L) and SP-3 (252 mg/L) and SP-4 (224 mg/L); on February 3, 2023 at SP-3 (137 mg/L); on December 6, 2023 at SP-1 (300 mg/L) and SP-2 (434 mg/L); on December 18, 2023 at SP-1 (136 mg/L) and SP-2 (136 mg/L); on February 17, 2024 at SP-4 (156 mg/L); on November 22, 2024 at SP-1 (488 mg/L); on December 12, 2024 at SP-1 (202 mg/L); on February 13, 2025 at SP-1 (330 mg/L); on April 10, 2026 at SP-1 (92 mg/L) and SP-2 (240 mg/L). Each of these results also exceeds the maximum monthly average effluent limitation for total suspended solids (27 mg/L), as do numerous additional results identified in Section II.B.2 of the CWA Notice Letter.

152. The storm water samples collected by Defendant at the Facility contained zinc in excess of the maximum daily effluent limitation for zinc in 40 C.F.R. § 445.21 (0.20 mg/L) on November 9, 2021 at SP-3 (2.7 mg/L); on December 22, 2021 at SP-3 (0.88 mg/L); on March 28, 2022 at SP-2 (0.32 mg/L) and SP-3 (0.84 mg/L); on April 11, 2022 at SP-3 (1.9 mg/L); on November 8, 2022 at SP-3 (0.64 mg/L); on December 27, 2022 at SP-1 (0.27 mg/L) and SP-3 (1 mg/L) and SP-4 (0.48 mg/L); on February 3, 2023 at SP-3 (0.25 mg/L) and SP-4 (2 mg/L); on March 28, 2023 at SP-4 (4.1 mg/L); on December 6, 2023 at SP-1 (0.82 mg/L); on December 18, 2023 at SP-1 (0.22 mg/L) and SP-4 (0.5 mg/L); on December 27, 2023 at SP-4 (0.46 mg/L); on January 31, 2024 at SP-4 (3.3 mg/L); on February 17, 2024 at SP-3 (0.78 mg/L) and SP-4 (2.3 mg/L); on March 2, 2024 at SP-3 (0.64 mg/L); on November 22, 2024 at SP-1 (0.98 mg/L); on December 12, 2024 at SP-1 (0.23 mg/L); on December 24, 2024 at SP-2 (0.51 mg/L) and SW-1 (0.24 mg/L) and TC-1 (0.23 mg/L); on February 13, 2025 at SP-1 (0.25 mg/L) and SP-2 (0.4 mg/L) and SP-3 (0.35 mg/L) and SP-4 (1.2 mg/L); on November 13, 2025 at SP-1 (0.263 mg/L); on April 10, 2026 at SP-1 (0.291 mg/L) and SP-2 (0.668 mg/L); on April 20, 2026 at SP-1 (0.273 mg/L). Each of these results also exceeds the maximum monthly average effluent limitation for zinc (0.11 mg/L), as do numerous additional results identified in Section II.B.3 of the CWA Notice Letter.

153. The pH results alleged above at SP-3 and SP-4 are below the minimum effluent limitation for pH in 40 C.F.R. § 445.21 (6.0 s.u.).

154. Defendant does not analyze its storm water discharges for BOD5, ammonia, alpha-terpineol, benzoic acid, p-cresol, or phenol. Plaintiff is informed and believes, and thereupon alleges, that the Facility's storm water discharges may exceed the effluent limitations in 40 C.F.R. § 445.21 for those pollutants as well.

**10. Defendant's Sample Results Are Evidence of Violations of the General Permit**

155. A true and accurate summary of the data reported by Defendant to the State Board via SMARTS through the date of the CWA Notice Letter, which is the basis for the allegations contained in the preceding paragraphs of this Section V.C, is contained in Section II of the CWA Notice Letter. The results for the sampling events of April 20 and April 28, 2026 are reported in the Monitoring Reports Defendant submitted to SMARTS after the date of the CWA Notice Letter, and evidence the same, continuing violations identified in the CWA Notice Letter.

156. Storm water discharges from the Facility containing total suspended solids, zinc, or pH at concentrations or values exceeding the effluent limitations of 40 C.F.R. § 445.21 are violations of Effluent Limitation V.B of the General Permit and the Act.

157. Exceedances of the EPA Benchmarks and NALs evidence repeated failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions.

158. Failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions are violations of the General Permit's technology-based effluent limitations and the Act. General Permit, Section V.A.

159. Storm water discharges from the Facility containing pollutants at concentrations exceeding the Basin Plan's pH objective and the Basin Plan's narrative objectives for suspended material, settleable material, sediment, and toxicity cause or contribute to exceedances of applicable water quality standards in the Receiving Waters, in violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions. General Permit, Sections III.C, III.D, VI.A, VI.B, and VI.C.

160. Plaintiff is informed and believes, and thereupon alleges, that Defendant has known

that its storm water discharges contain pollutants at concentrations exceeding applicable water quality standards, EPA Benchmarks, NALs, and effluent limitation guidelines since at least July 1, 2016, when the Facility first entered Level 1 status.

161. Plaintiff is informed and believes, and thereupon alleges, that such violations occur each time storm water discharges from the Facility. Attachment A to the CWA Notice Letter identifies the specific dates on which Plaintiff alleges Defendant discharged storm water containing pollutants in violation of the General Permit, and is incorporated herein by reference.

**D. Defendant's Level 2 Status and Failure to Implement BAT/BCT**

162. The Facility entered Level 1 ERA status for pH, total suspended solids, iron, aluminum, cadmium, and zinc on July 1, 2016, and entered Level 2 status for total suspended solids, iron, aluminum, cadmium, and zinc on July 1, 2017. The Facility has remained in Level 2 status for each of those five parameters continuously since July 1, 2017.

163. The Facility entered Level 2 status for chemical oxygen demand on July 1, 2020, returned to baseline status for chemical oxygen demand in 2022 and 2023, and re-entered Level 2 status for chemical oxygen demand on July 1, 2024, where it remains. The Facility entered Level 2 status for pH on July 1, 2022 and returned to baseline status for pH on July 1, 2025.

164. In December 2023, Defendant submitted a new Level 2 ERA Action Plan because Drainage Area 4, which Defendant created during the 2022–2023 reporting year, exceeded the NALs for total suspended solids, iron, aluminum, cadmium, zinc, and pH in its first year of existence.

165. Defendant's Level 2 ERA Action Plans of December 2017, June 2019, December 2020, December 2022, and December 2023, and every Level 2 ERA Technical Report and annual update Defendant has submitted, selected the Industrial Activity BMPs Demonstration for every parameter and drainage area.

166. In June 2019, Defendant requested, and the Regional Board granted, a three-year extension of the deadline for its Level 2 ERA Technical Report. Defendant told the Regional Board that it had "spent over $750,000" on BMPs. That is the only cost figure that appears in any of Defendant's ERA filings from 2017 through 2026.

167. Defendant has failed to implement and maintain the minimum BMPs required by the General Permit, including erosion and sediment controls, spill and leak prevention and response, and material handling and waste management, as evidenced by the exceedances identified above. General Permit, Section X.H.1(a)–(g).

168. Defendant has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, or other advanced BMPs necessary to comply with the General Permit's effluent limitations, in Drainage Areas 2, 3, 4, and 5, and has failed to implement and maintain a permanent treatment control BMP in Drainage Area 1. General Permit, Section X.H.2.

169. Drainage Area 3. In February through May 2018, Defendant piloted a settling and sand media filtration system rated at 500 gallons per minute on runoff collected from the Cell 3 area. In June 2019, Defendant reported to the Regional Board that the pilot and bench testing results "indicated significant active treatment was necessary to meet Industrial General Permit NALs" and that treatment "could require a multi-step process," and that Defendant would instead pursue larger sedimentation basins. Defendant has never reported the pilot's influent and effluent data.

170. In its ERA filings since June 2019, Defendant has characterized active treatment of Drainage Area 3 as "impractical," and in its 2026 SWPPP Defendant characterizes treatment of Drainage Area 3 as "cost prohibitive," but Defendant has never evaluated the cost of any treatment system for Drainage Area 3 or compared that cost to the benefit.

171. The sedimentation basins Defendant built instead were, in Defendant's words, sized "to meet topography and operational needs, rather than a pre-determined additional capacity factor"; were "washed out by large January 2019 storms"; were amended with crushed concrete that "did not have adequate pH buffering capacity"; and were enlarged in 2021 and 2023 without eliminating pH or metals exceedances at SP-3.

172. During the spring of 2024, Defendant "inadvertently" applied green waste and mulch as cover on areas of Cell 3B that drain to the Cell 3B sedimentation basin, producing chemical oxygen demand results of 1,200 mg/L and 1,100 mg/L at SP-3 on February 17 and March 2, 2024.

173. Beginning in December 2025, Defendant began pumping the contents of the Cell 3B sedimentation basin to the leachate ponds before forecast storms, which Defendant reports prevented discharge from SP-3 during all but one QSE in the 2025–2026 reporting year. Defendant thus has the means to prevent most discharges from Drainage Area 3 and did not use them until the ninth year of Level 2 status.

174. Drainage Area 1. Defendant abandoned a planned MRF sedimentation basin in 2019 and a designed underground detention basin in 2020, and in October 2021 rented a temporary flow-through treatment system for the MRF "on a one-year trial basis." In June 2022, Defendant reported that it was "bidding and implementing a permanent treatment system" and intended "to have full implementation of a permanent flow-through treatment system for the start of the 2023-2024 reporting period." No permanent system was built.

175. Defendant has instead rented a temporary treatment system for Drainage Area 1 each wet season since 2021 from different vendors with different treatment chemistries. Defendant has admitted that "[t]he installation of the temporary treatment system has been delayed during some reporting years, as a result of the public entity contracting process," and that "[s]ome discharges at SP 1 occurred when the temporary treatment system was not yet available."

176. Defendant's monitoring reports show untreated discharges from Drainage Area 1 at SP-1, with no treatment system in operation, on December 6 and December 18, 2023; on November 22, 2024; and on November 13, 2025. Defendant's 2025–2026 Annual Report states that "[t]he treatment system in Drainage Area 1 was not installed until January 2026."

177. Defendant issued a contract for a permanent treatment system for Drainage Area 1 in July 2026, after receiving the CWA Notice Letter. Even when operating, the rental treatment system did not reduce iron or aluminum below the annual NALs at TC-1 in the 2024–2025 reporting year.

178. Defendant sized the Drainage Area 1 treatment system at 321 gallons per minute using the 0.2 inch per hour method in Section X.H.6.b.i of the General Permit and designed the diversion box so that all flow above that rate bypasses treatment. Plaintiff is informed and believes, and thereupon alleges, that the design incorporates no factor of safety and that the hydrologic calculations were not certified by a California licensed professional engineer.

179. Drainage Areas 2 and 4. Defendant's BMPs in Drainage Areas 2 and 4 consist of vegetated swales, wattles, mulch, hydroseeding, jute netting, flocculent, and stockpile relocation. Defendant has reported that "[t]he vegetated swales have not been effective in reducing Fe or Al" and that its BMPs in these areas "were not as effective in reducing Al and Fe concentrations." Defendant has never evaluated or costed treatment for either drainage area; the 2026 SWPPP states only that treatment "would require space to place the units, labor, and significant cost for minimal benefit," without any cost figure, space analysis, or comparison to benefit. Iron and aluminum concentrations at SP-2 and SP-4 increased between the 2024–2025 and 2025–2026 reporting years.

180. Drainage Area 5. Defendant has implemented no BMPs directed at storm water that contacts the leachate ponds, the leachate pumping station, the leachate pipeline, or the area of the December 2020 leachate release, beyond visual observation of the ponds for overflow.

181. Each day that Defendant has failed to develop and implement BMPs that achieve BAT and BCT at the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least July 8, 2021.

### E. Defendant's Failure to Comply with the Exceedance Response Action Requirements

182. Defendant's Level 2 ERA Technical Report updates of July 2024 and July 2025, and its December 2024 Level 2 ERA Technical Report for Drainage Area 4, each represented that Defendant's implemented BMPs "are expected to eliminate future NAL exceedances." Those representations were made in the seventh and eighth years of continuous exceedances and had no reasonable basis.

183. In its July 2026 Level 2 ERA Technical Report Update, Defendant withdrew that representation, stating instead that its BMPs "achieve compliance with most NALs" and that "industrial BMPs, while effective at reducing COD, Fe, and Al concentrations . . . are potentially not expected to reduce these parameters below natural background levels."

184. No Level 2 ERA Technical Report or update submitted by Defendant, from the first in December 2021 through the most recent in July 2026, contains an evaluation of additional BMPs

that would reduce or prevent NAL exceedances, an estimate of their costs, or an analysis of the basis for selecting the BMPs implemented in lieu of them, as Section XII.D.2.a.iv of the General Permit requires, and none specifically addresses Drainage Area 1 at SP-1, where untreated discharges have exceeded the NALs in every reporting year, as Section XII.D.2.a.v requires.

185. Defendant's Level 2 ERA Technical Reports have also failed to evaluate all pollutant sources associated with industrial activity that are or may be related to the exceedances, as Section XII.D.2.a.ii requires, including leachate seeps, landfill-derived groundwater, the leachate ponds and pipeline in Drainage Area 5, and waste-contacted equipment.

186. Defendant's July 2026 Level 2 ERA Technical Report Update presents a "preliminary" evaluation of whether the Facility might in the future make a Natural Background Pollutant Source Demonstration. Defendant abandoned a Non-Industrial Pollutant Source Demonstration in June 2019 after concluding that its data "suggest little influence from run-on and non-industrial sources," and Defendant's consultants attributed the low pH and metals in Drainage Area 3 to "[s]oil excavation, stockpiling, and handling" that "exposes naturally low pH soil to stormwater," which is an industrial activity. The July 2026 evaluation concedes that "[a]dditional data collection is needed, including selection and sampling of an appropriate reference site," and reports that the highest aluminum and cadmium concentrations among its soil and rock samples came from mudstone "exposed as a part of landfill activities in Drainage Area 3." No natural background or non-industrial demonstration has been submitted.

187. Plaintiff is informed and believes, and thereupon alleges, that the annual NAL exceedance for chemical oxygen demand in the 2023–2024 reporting year that returned the Facility to Level 2 status for chemical oxygen demand on July 1, 2024 was driven by discharges from Drainage Area 3, a drainage area not addressed in Defendant's December 2020 Level 2 ERA Action Plan for chemical oxygen demand, and that Defendant failed to submit a Level 2 ERA Action Plan addressing that new exceedance by January 1, 2025, as Section XII.D.1.a of the General Permit requires.

188. Each day that Defendant has failed to comply with the Level 2 ERA requirements of Section XII.D of the General Permit is a separate and distinct violation of the General Permit and the

Act. Defendant has been in violation of the ERA requirements of the General Permit every day since at least July 8, 2021.

**F. Defendant's Failure to Develop and Implement an Adequate SWPPP**

189. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate SWPPP for the Facility.

190. From July 8, 2021 through August 30, 2026, Defendant's SWPPP for the Facility, in each of its versions (SWPPP Amendments 11 through 15), did not identify the leachate ponds, the leachate pumping station, the leachate pipeline, or any other part of the LCRS or of Drainage Area 5 as an area of industrial activity, and did not show the LCRS on the site map, although the LCRS is a waste treatment area and a structural control measure affecting storm water within the meaning of Sections X.E.3.c and X.E.3.f of the General Permit.

191. From July 8, 2021 through August 30, 2026, the site maps in Defendant's SWPPP did not identify areas of soil erosion, impervious areas, or the locations of significant spills and leaks, as Sections X.E.3.a, X.E.3.d, and X.E.3.e of the General Permit require. Defendant added areas of soil erosion, impervious areas, and the LCRS piping to its SWPPP figures for the first time in the 2026 SWPPP, after receiving the CWA Notice Letter.

192. Defendant's SWPPP did not, and the 2026 SWPPP does not, identify and justify the advanced BMPs not being implemented in Drainage Areas 2, 3, 4, and 5, as Section X.H.4.b of the General Permit requires. The 2026 SWPPP's justification consists of conclusory assertions of cost with no cost estimate, space analysis, or comparison to benefit.

193. Defendant's SWPPP did not, and the 2026 SWPPP does not, describe the design basis, factor of safety, or professional engineer certification of the Drainage Area 1 treatment system, or describe procedures for logging or sampling bypass of that system, as Sections X.H.4.a, X.H.6, and XI.A.2.b of the General Permit require.

194. Defendant's Monitoring Implementation Plan did not, and the 2026 SWPPP's Monitoring Implementation Plan does not, identify any discharge location or alternative discharge location for Drainage Area 5 or justify its omission, as Sections X.I.2 and X.I.3 of the General Permit require. The 2026 SWPPP states only that the leachate ponds "are monitored during rain

events to visually observe for overflow" and that if overflow occurs the ponds "would be sampled at an alternative discharge point."

195. Defendant's SWPPP's assessment of potential pollutant sources did not, and the 2026 SWPPP's assessment does not, address leachate seeps and iron-laden groundwater upwelling in the West Canyon and on the slopes of closed and inactive landfill cells as pollutant sources for Drainage Area 2, as Section X.G.2 of the General Permit requires.

196. The 2026 SWPPP continues to designate all of Drainage Area 5 other than the leachate ponds, and the downhill portions of Drainage Areas 1 through 4, as non-industrial, although those areas receive storm water from areas of industrial activity and, on information and belief, leachate and landfill-derived groundwater. The 2026 SWPPP also states that "there have been no significant spills or leaks within the previous five (5) years."

197. Defendant has failed to implement the BMPs described in its SWPPP, including by failing to install the Drainage Area 1 treatment system before the wet season in 2023, 2024, and 2025; by applying green waste as cover in areas draining to the Cell 3B sedimentation basin in 2024; and by failing to complete the slope stabilization and drainage inlet protection its SWPPP requires "before October 1 of each year" in 2021, when, according to Defendant's 2021 Report of Wet Weather Preparedness, the installation of straw wattles and the establishment of drainage inlets on and around the Cell 3B soil stockpiles were not completed until November 12, 2021.

198. Defendant has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary in response to the analytical results of its storm water monitoring, as required by the General Permit. General Permit, Sections X.B, X.C.1.b, and XV.

199. The discharges of storm water from the Facility containing pollutant concentrations exceeding EPA Benchmarks, NALs, effluent limitation guidelines, and water quality standards evidence Defendant's failure to develop, implement, and revise a lawful SWPPP.

200. Each day that Defendant has failed to develop and implement an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and the Act. Defendant has been in violation of the SWPPP requirements of the General Permit every day since at least July 8, 2021.

### G. Defendant's Failure to Implement an Adequate Monitoring Implementation Plan

201. Defendant has conducted and continues to conduct industrial activities at the Facility without developing, implementing, or revising a compliant Monitoring Implementation Plan.

202. Defendant has failed to collect and analyze storm water samples from the required number of QSEs in each half of each reporting year from each drainage area at all discharge locations. In seven of the eight reporting years from 2018–2019 through 2025–2026, Defendant's Annual Report acknowledged that Defendant did not collect samples from the required number of QSEs at all discharge locations. Specifically, according to Defendant's own reports, Defendant collected no samples at SP-1 during the first half of the 2021–2022 reporting year or the second half of the 2022–2023 reporting year, and only one sample at SP-1 during the second half of the 2021–2022 reporting year, the first half of the 2022–2023 reporting year, the second half of the 2023–2024 reporting year, and the first half of the 2025–2026 reporting year; collected no samples at SP-3 during the first half of the 2023–2024, 2024–2025, and 2025–2026 reporting years, and only one sample at SP-3 during the second half of the 2024–2025 and 2025–2026 reporting years; and collected no samples at TC-1 during the first half of the 2025–2026 reporting year.

203. Defendant has never collected a sample of the discharge from Drainage Area 5 before it commingles with discharges from Drainage Areas 1 and 3, in any reporting year, and has never identified a discharge location or alternative discharge location for that drainage area.

204. On February 16, 2026, the only QSE of the 2025–2026 reporting year during which SP-3 discharged, Defendant collected samples at TC-1, SP-1, SP-2, SP-3, and SP-4. Defendant then stored the samples in a refrigerator, where, in Defendant's words, "[a] refrigeration system malfunction during storage resulted in all bottles freezing and subsequently breaking." No laboratory analysis was performed on any sample from that event; only field pH was reported. The chain of custody form for the samples records no date or time of relinquishment or receipt, no receiving signature, and no receiving temperature. As a result, Defendant obtained no analytical data for chemical oxygen demand, iron, aluminum, cadmium, or zinc from Drainage Area 3 for the entire 2025–2026 reporting year.

205. Each of Defendant's Annual Reports for the 2021–2022 through 2025–2026 reporting years states that storm water contained in the Drainage Area 1 treatment tanks was discharged after treatment in late April or May (on May 19, 2022, April 27, 2023, April 22, 2024, April 28, 2025, and April 28, 2026) and was "sampled and reported as a QSE." Plaintiff is informed and believes, and thereupon alleges, that these discharges of contained storm water were not QSEs as defined in Section XI.B.1 of the General Permit and were counted by Defendant toward the required number of QSE samples for the second half of each reporting year.

206. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to sample bypass at SP-1 during sampling events at which flow bypassed the Drainage Area 1 treatment system, in violation of Section XI.A.2.b of the General Permit.

207. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to collect samples during QSEs that produced discharges during scheduled facility operating hours, including QSEs that began overnight and were still discharging at the start of operations, in violation of Section XI.B.5 of the General Permit, on dates including those identified in Section II.G.2 of the CWA Notice Letter.

208. Defendant has never analyzed any storm water sample from the Facility for BOD5, ammonia as nitrogen, alpha-terpineol, benzoic acid, p-cresol, or phenol, and has never reported the information required of a discharger subject to Subchapter N in any Annual Report, in violation of Sections XI.B.6.g and XI.D of the General Permit. Defendant's SWPPP stated from July 2015 through December 2018 that the Facility "is subject to Subchapter N ELGs mandating pH analysis"; Defendant deleted that statement in SWPPP Amendment 7 (December 20, 2018) and has since asserted that no Subchapter N parameters need be monitored.

209. Each day that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility, and each day that Defendant has failed to collect, preserve, analyze, and report storm water samples as the General Permit requires, is a separate and distinct violation of the General Permit and the Act. Defendant has been in violation of the monitoring requirements of the General Permit every day since at least July 8, 2021.

**H. Leachate and Landfill Groundwater Reach the Storm Water System**

210. Defendant's SWPPP states that the Facility has separate leachate and storm water collection systems in order "to prevent leachate from being introduced into the surface runoff going into Lombardi Creek." Defendant's own records show that the separation fails.

211. Defendant's 2009 SWPPP states that the original 36-inch and 30-inch storm drain culverts under the waste prism, which were built to carry the canyon streams to Lombardi Creek, are "now sealed at the upstream ends but leachate and groundwater are able to flow into them due to cracks in the pipeline walls."

212. In December 2020, leachate from the broken leachate pipeline entered a storm water catch basin and reached the Lombardi Creek outlet box.

213. In February 2023, following an inspection of the Facility, a Regional Board engineer wrote to Defendant that the bench, slopes, and drainages in the West Canyon "need[] to be evaluated and reworked to prevent the saturated conditions that we observed," and that "there appears to be a lot of upgradient groundwater seeping up through the asphalt at the bottom of the west canyon again due to the groundwater cutoff wall. Lots of iron staining and algae growth from the consistent seepage." The West Canyon drains to SP-2 and SW-2.

214. Defendant's SWPPP acknowledges that leachate seeps occur at the active face during storms and that Defendant's seep BMPs exist to prevent leachate from reaching the storm drain system.

215. Plaintiff is informed and believes, and thereupon alleges, that leachate and landfill-derived groundwater have entered and continue to enter the Facility's storm water conveyances, the Freshwater Bypass, and the West Canyon drainage through seeps at the active face and on the slopes of closed and inactive cells, through cracks in the culverts beneath the waste prism, through groundwater upwelling at the toe of the West Canyon, and through leaks and releases from the leachate pipeline, and are discharged, directly or indirectly, to Lombardi Creek at SW-1 and SW-2 on days with and without precipitation.

216. Leachate and landfill-derived groundwater are not non-storm water discharges authorized by Section IV of the General Permit, and no other NPDES permit authorizes their

discharge from the Facility.

**I. Defendant's Violations Are Ongoing**

217. The violations alleged in this Complaint are ongoing and continuous. Defendant continues to discharge storm water from the Facility during every significant storm event; continues to operate without treatment or adequate BMPs in Drainage Areas 2, 3, 4, and 5 and without a permanent treatment system in Drainage Area 1; continues to monitor and report under the same deficient practices; and continues to operate under a SWPPP that does not comply with the General Permit. Absent the relief requested, the violations are reasonably likely to continue and recur.

## VI. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

**Discharges of Contaminated Storm Water from the Facility in Violation of the General Permit's Technology-Based Effluent Limitations and the Act**

**(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

218. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

219. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed, and continues to fail, to reduce or prevent pollutants associated with its industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT treatment standards, as evidenced by, among other things, the continuous annual NAL exceedances described above in the ninth year of Level 2 status; the absence of any treatment of the discharges from Drainage Areas 2, 3, 4, and 5; Defendant's reliance on late-installed rental treatment in Drainage Area 1 and its untreated discharges from that drainage area; the failure of Defendant's sedimentation basins, crushed concrete, and vegetated swales, by Defendant's own account, to control metals and pH; and Defendant's acknowledgment in July 2026 that its BMPs are not expected to eliminate future exceedances.

220. Plaintiff is informed and believes, and thereupon alleges, that Defendant discharges storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

221. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. See General Permit, Sections V.A, X.H.1, X.H.2; 33 U.S.C. § 1311(b).

222. Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control is discharged from the Facility.

223. Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

224. Defendant's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

225. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

226. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

227. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SECOND CLAIM FOR RELIEF**

**Discharges of Contaminated Storm Water from the Facility in Violation of the Landfill Effluent Limitation Guidelines, Effluent Limitation V.B of the General Permit, and the Act**

**(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f); 40 C.F.R. Part 445)**

228. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

229. The Facility is a landfill subject to 40 C.F.R. Parts 257 and 258 and is a facility subject to the storm water effluent limitation guidelines of 40 C.F.R. Part 445, Subpart B. The General Permit, through Effluent Limitation V.B and Attachment F, prohibits industrial storm water discharges from the Facility that exceed the effluent limitations in 40 C.F.R. §§ 445.21 through 445.23.

230. Storm water discharged from the following areas of the Facility is "contaminated storm water" within the meaning of 40 C.F.R. § 445.2(b) because it comes into direct contact with landfill wastes, waste handling and treatment areas, or landfill wastewater:

a. Drainage Area 3, sampled at SP-3 and discharged at SW-1, where storm water contacts the diversion deck on which green waste, wood waste, and C&D wastes are dumped, stockpiled, and processed; trucks, compactors, and other equipment that have been in direct contact with landfill waste at the active face; areas of Cell 3B on which green waste and mulch were applied as cover; and leachate that seeps from over-saturated fill outside Defendant's containment berms;

b. Drainage Area 1, sampled at TC-1 and SP-1 and discharged at SW-1, where storm water contacts the public tipping area, the recycling center drop-off, the household hazardous waste drop-off, the C&D and green waste receiving areas, and the equipment maintenance area, each of which is a waste handling area at the landfill facility, and vehicles and equipment that have been in direct contact with waste;

c. Drainage Area 5, not separately sampled and discharged at SW-1, where storm water contacts the areas around the leachate ponds, the leachate pumping station, and the leachate transport pipeline, which are wastewater treatment areas, and the location of the December 2020 leachate release; and

d. Drainage Areas 2 and 4, sampled at SP-2 and SP-4 and discharged at SW-2, to the extent storm water in those areas contacts leachate seeps, leachate-bearing groundwater, or waste-contacted equipment and materials on the slopes and stockpiles.

231. Since at least July 8, 2021, Defendant has discharged contaminated storm water from

the Facility containing total suspended solids, zinc, and pH in excess of the maximum daily and maximum monthly average effluent limitations of 40 C.F.R. § 445.21 on each of the sampling dates identified above and in the CWA Notice Letter, and, on information and belief, on every other date on which the Facility discharged storm water since July 8, 2021, and, on information and belief, has discharged BOD5, ammonia, alpha-terpineol, benzoic acid, p-cresol, and phenol in excess of those limitations on the same dates.

232. Defendant has also violated Sections XI.B.6.g and XI.D of the General Permit by failing to collect and analyze samples of its contaminated storm water discharges for each pollutant regulated by 40 C.F.R. § 445.21 and by failing to report the required Subchapter N information in its Annual Reports, in every reporting year since at least July 8, 2021.

233. Each and every violation of the effluent limitation guidelines incorporated in Effluent Limitation V.B of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

234. Defendant's violations of the effluent limitation guidelines, Effluent Limitation V.B of the General Permit, and the Act are ongoing and continuous.

235. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

236. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

237. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**THIRD CLAIM FOR RELIEF**

**Failure to Comply with the Exceedance Response Action Requirements of Section XII.D of the General Permit**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

238. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

239. Defendant has been in Level 2 status for total suspended solids, iron, aluminum, cadmium, and zinc since July 1, 2017, for chemical oxygen demand since July 1, 2024 (and previously from July 1, 2020), and for pH from July 1, 2022 through June 30, 2025, and has selected the Industrial Activity BMPs Demonstration for every parameter and drainage area.

240. Defendant's implemented BMPs have not achieved compliance with the effluent limitations of the General Permit and, as the continuing exceedances and Defendant's own July 2026 update establish, are not expected to eliminate future NAL exceedances. Section XII.D.2.a.iv of the General Permit therefore required each of Defendant's Level 2 ERA Technical Reports and annual updates submitted since July 8, 2021, including those of December 2021, June 2022, July 2023, December 2023, July 2024, December 2024, July 2025, and July 2026, to include an evaluation of additional BMPs that would reduce or prevent NAL exceedances, the estimated costs of those BMPs, and an analysis of the basis for selecting the BMPs implemented in lieu of them, and Section XII.D.2.a.v required that analysis to address specifically each drainage area where the exceedances responsible for Level 2 status occurred, including Drainage Area 1 at SP-1. None of Defendant's reports contains that evaluation, those cost estimates, or that analysis.

241. Defendant's certifications in its July 2024, December 2024, and July 2025 reports that its implemented BMPs were expected to eliminate future NAL exceedances were made without a reasonable basis and were withdrawn in July 2026. Defendant's reports have also failed to include an evaluation of all pollutant sources associated with industrial activity that are or may be related to the exceedances, as Section XII.D.2.a.ii requires.

242. Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to submit a Level 2 ERA Action Plan addressing the new Level 2 NAL exceedance for chemical

oxygen demand in Drainage Area 3 by January 1, 2025, as Section XII.D.1.a of the General Permit requires.

243. Each of the foregoing failures is a separate and distinct violation of a condition of the General Permit and of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

244. Defendant's violations of the ERA requirements of the General Permit and the Act are ongoing and continuous.

245. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

246. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

247. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CLAIM FOR RELIEF**

**Failure to Prepare, Implement, Review, and Update**

**a Compliant Storm Water Pollution Prevention Plan**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

248. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

249. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate SWPPP for the Facility, in violation of Sections X.A, X.C, X.E.3, X.G.2, X.H.4, X.I.2, and X.I.3 of the General Permit, in each of the respects alleged above.

250. Plaintiff is informed and believes, and thereupon alleges, that Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.

Defendant continues to be in violation of the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

251. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to implement the BMPs described in its SWPPP, including the timely installation of the Drainage Area 1 treatment system and the stabilization of erodible slopes and stockpiles before the wet season.

252. Defendant's violations of the General Permit's SWPPP requirements are ongoing and continuous.

253. Each day since July 8, 2021 that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

254. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

255. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

256. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FIFTH CLAIM FOR RELIEF**

**Failure to Develop, Implement, and Revise an Adequate**

**Monitoring Implementation Plan for the Facility**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

257. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

258. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop, implement, and adequately revise a legally adequate Monitoring Implementation Plan and

monitoring and reporting program for the Facility, in violation of Sections X.I and XI of the General Permit.

259. Defendant has failed to collect and analyze storm water samples from two QSEs in each half of each reporting year from each drainage area at all discharge locations, in violation of Sections XI.B.2 and XI.B.4 of the General Permit; has failed to collect any separate sample of the discharge from Drainage Area 5 and to identify a discharge location or alternative discharge location for that drainage area, in violation of Sections XI.B.4 and XI.C.3; has failed to preserve, handle, and analyze the samples collected on February 16, 2026, in violation of Sections XI.B.2, XI.B.6, XI.B.8, and XI.B.10 and Attachment H; has counted late-season discharges of contained storm water from the Drainage Area 1 treatment tanks as QSE samples, in violation of Sections XI.B.1 and XI.B.2; has failed to sample bypass of the Drainage Area 1 treatment system, in violation of Section XI.A.2.b; has failed to analyze samples for the additional parameters required by Subchapter N and to report Subchapter N information in its Annual Reports, in violation of Sections XI.B.6.g and XI.D; and has failed to collect samples during QSEs that produced discharges during scheduled facility operating hours, in violation of Section XI.B.5.

260. Defendant's violations of the General Permit's monitoring and reporting requirements and the Act are ongoing and continuous.

261. Each day since July 8, 2021 that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility, and each failure to collect, preserve, analyze, or report a sample as the General Permit requires, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

262. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

263. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

264. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SIXTH CLAIM FOR RELIEF**

**Unauthorized Non-Storm Water Discharges from the Facility in Violation of Discharge Prohibition III.B of the General Permit and the Act**

**(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

265. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

266. As alleged in Paragraph 215, Defendant has discharged and continues to discharge leachate and landfill-derived groundwater, which are liquids or materials other than storm water, directly or indirectly to Lombardi Creek at SW-1 and SW-2, on days with and without precipitation, since at least July 8, 2021.

267. Leachate and landfill-derived groundwater are not non-storm water discharges authorized by Section IV of the General Permit, and no other NPDES permit authorizes their discharge from the Facility. Defendant has failed to eliminate these unauthorized non-storm water discharges as Discharge Prohibition III.B of the General Permit requires.

268. Each such discharge is a separate and distinct violation of Discharge Prohibition III.B of the General Permit and of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

269. Defendant's unauthorized non-storm water discharges and its violations of the General Permit and the Act are ongoing and continuous.

270. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

271. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

272. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SEVENTH CLAIM FOR RELIEF**

**Discharges of Contaminated Storm Water from the Facility in Violation of the General Permit's Receiving Water Limitations, Discharge Prohibitions, and the Act**

**(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

273. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

274. Since at least July 8, 2021, Defendant has discharged storm water from the Facility containing pollutants at concentrations that cause or contribute to exceedances of applicable water quality standards, including the Basin Plan's pH objective and the Basin Plan's narrative objectives for suspended material, settleable material, sediment, and toxicity, in violation of the General Permit's Receiving Water Limitations. General Permit, Section VI.A.

275. Since at least July 8, 2021, Defendant has discharged storm water from the Facility containing pollutants that adversely affect human health and the environment, in violation of the General Permit's Receiving Water Limitations. General Permit, Section VI.B.

276. Since at least July 8, 2021, Defendant has discharged storm water from the Facility containing pollutants in quantities that cause or threaten to cause pollution, contamination, or nuisance, in violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions. General Permit, Sections III.C and VI.C.

277. Since at least July 8, 2021, Defendant has discharged storm water from the Facility in violation of discharge prohibitions contained in the Basin Plan, in violation of the General Permit's Discharge Prohibitions. General Permit, Section III.D.

278. Plaintiff is informed and believes, and thereupon alleges, that discharges of storm water containing pollutants that cause or contribute to exceedances of applicable water quality standards, adversely affect human health and/or the environment, and cause or threaten to cause pollution, contamination, or nuisance occur each time storm water discharges, or has discharged,

from the Facility.

279. Defendant's violations of the General Permit's Receiving Water Limitations and Discharge Prohibitions are ongoing and continuous.

280. Each and every violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

281. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

282. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

283. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a. Declare Defendant to have violated and to be in violation of the General Permit and the Clean Water Act as alleged herein;

b. Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the General Permit;

c. Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d. Order Defendant to immediately implement storm water pollution control technologies and measures that satisfy BAT and BCT in every drainage area of the Facility, including treatment control BMPs designed and certified in accordance with Section X.H.6 of the General Permit, and that prevent pollutants in the Facility's storm water discharges from exceeding

the effluent limitations of 40 C.F.R. Part 445 or causing or contributing to violations of any water quality standards;

e. Order Defendant to eliminate all unauthorized non-storm water discharges from the Facility;

f. Order Defendant to comply with the General Permit's monitoring and reporting requirements, including sampling of every drainage area at every discharge location and analysis for every parameter required by Subchapter N, and including supplemental monitoring to compensate for past monitoring violations;

g. Order Defendant to prepare a SWPPP and Monitoring Implementation Plan for the Facility consistent with the General Permit's requirements and to implement procedures to regularly review and update the SWPPP;

h. Order Defendant to submit Level 2 ERA Technical Reports that comply with Section XII.D of the General Permit;

i. Order Defendant to pay civil penalties of up to $68,445 per day per violation for each violation of the General Permit and the Act occurring from July 8, 2021 to the present, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. §§ 19.1–19.4;

j. Order Defendant to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by its activities;

k. Award Plaintiff its costs of litigation, including reasonable attorney, expert witness, and consultant fees, as authorized by Section 505(d) of the Act, 33 U.S.C. § 1365(d); and

l. Award such other and further relief as this Court may deem just and appropriate.

Dated: October 5, 2026

Respectfully submitted,

LAW OFFICE OF WILLIAM CARLON

By: /s/ William N. Carlon
William N. Carlon

Attorneys for Plaintiff
MONTEREY WATERKEEPER

MONTEREY WATERKEEPER

By: /s/ Natalie Herendeen
Natalie Herendeen
Attorneys for Plaintiff
MONTEREY WATERKEEPER